## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| OCEAN SPRAY CRANBERRIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-CV-11738 RWZ |
| ) | |
| DECAS CRANBERRY PRODUCTS, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |
| ) | |
| DECAS CRANBERRY PRODUCTS, INC., ) | |
| ) | |
| Plaintiff-in-counterclaim, ) | |
| ) | |
| v. ) | |
| ) | |
| OCEAN SPRAY CRANBERRIES, INC. and ) | |
| RANDY C. PAPADELLIS, ) | |
| ) | |
| Defendants-in-counterclaim. ) | |
| _____ | |

### DECLARATION OF DR. ERIC WILHELMSEN IN SUPPORT OF
### DECAS CRANBERRY'S CLAIM CONSTRUCTION BRIEF

I, Dr. Eric Wilhelmsen, pursuant to 28 U.S.C. § 1746, declare as follows:

1. Decas Cranberry Products, Inc. has retained me as a technical expert. This declaration is based on my personal knowledge, my observations during Ocean Spray's initial inspection of Decas's facilities, input from counsel, and information contained in the documents referred to below.

2. I have served for over 20 years in both academic and industrial positions in food science and food related industries. In these roles, I have provided technical leadership and innovation for industrial collaborations such as the Technical Committee for Juice and Juice

1

Products, and the container enhancement effort of the Juice Products Committee of the National Food Processors Association.  My technical contributions and practical innovations have been instrumental in establishing new revenue streams and profitable businesses in juices, dietary supplements and botanicals, agricultural commodities, by-products, and beverages.

3.   I received a Ph.D. in Agricultural and Environmental Chemistry from the University of California at Davis in 1983, an M.S. in Food Science and Technology from the University of California at Davis in 1980, and a B.S. in Food Biochemistry (High Honors and Departmental Citation) from the University of California at Davis in 1979.

4.   My main areas of professional activity are analytical chemistry, biotechnology, food science, food technology and nutrition.  In those fields, I have been author or co-author of more than 18 publications, including peer-reviewed journal articles and contributions to the *Handbook of Food Analysis* (2003) and the *Encyclopedia of Analytical Chemistry: Applications, Theory, and Instrumentation* (2000).  I have also provided more than a dozen invited conference presentations, workshops, and symposium presentations.  I am a member of the American Chemical Society (ACS), the AOAC (formerly the Association of Official Analytical Chemists (AOAC), the Institute of Food Technology (IFT) where I served as a councilor and section chair, and the Technical Committee for Juice and Juice Products (TCJJP), where I have served as chair and as a board member.  A copy of my curriculum vitae is attached as Exhibit A.

5.   In connection with the preparation of this declaration, I have reviewed the following materials:

   a.   U.S. Patent No. 5,320,861 ("the '861 Patent");

   b.   The parties' Preliminary Stipulation Regarding Claim Construction (the "Stipulation").

**Formulation step**

6.  It appears from the Stipulation that Ocean Spray maintains that the formulation step of the '861 Patent ("formulating an infusion liquid having inherent soluble fruit component at a level equal to or greater than said decharacterized fruit") may be met if the infusion liquid is formulated such that the gross, or total, weight of acid in the infusion syrup is greater than or equal to the gross weight of acid in the pre-infusion fruit.  (I understand from counsel that both parties are using acid as a proxy for inherent soluble fruit components. This is a sensible approach, given the predominance of acid in that component.)

7.  This interpretation of the formulation step rests on a reading of the claim term "level" (which under the Stipulation means concentration) that is inconsistent with normal usage and leads to incorrect conclusions regarding diffusion and concentration gradients.  This interpretation also implies an importance to the ratio of syrup to fruit that is also incorrect and not taught by the patent.

8.  It is well known that concentration can be measured, reported or determined using a number of different measurements and units depending on the circumstance. Concentration measures are divided into three general categories, depending on the basis used for reporting: by weight, by volume. and as ratios.  Ratios are not germane to this discussion.

9.  An example of the by-weight category is  degrees Brix, a unit of concentration used in the '861 patent.  Degrees Brix  is typically measured with either a hydrometer or refractometer calibrated in degrees Brix.  For practical purposes, degrees Brix measure the weight/weight percentage of sugars for solutions with a large fraction of sugar among the solutes.  Weight/weight concentrations can be expressed in other units as convenient, such as parts per million or percent.  The key feature of these by-weight measures is that the basis is the

relative total weight of the fraction.  This is a convenient basis because weights are additive.  Matter is not made or lost in mixing. If two known masses of two solutions of known weight/weight concentrations are mixed, the concentration of the resulting solution can be calculated without additional information.

10. The by-volume category uses the relative total volume of the fraction as a basis. Volumes are not strictly additive, particularly when solutes are not dilute.  Two 100 ml samples of different solutions do not necessarily yield 200 mls of a new solution when mixed. The basis is not strictly additive.  Nevertheless, weight/volume measures, such as molarity (the concentration of a substance in solution, expressed as the number moles of solute per litre of solution), have utility.  A solute can be dissolved in a small amount of water and then diluted to a known volume in a volumetric flask.  This can be very useful in an analytical laboratory because tools exist for accurately delivering volumes. Ultimately, one chooses a basis and unit of measure for convenience and utility.

11. In the present context, "weight/weight" measures of acid concentration are those fractions in which (a) for the fruit: the numerator is the weight of acid in the berry, and the denominator the overall weight of the berry, and (b) for the infusion liquid: the numerator is the weight of the acid in the infusion liquid, and the denominator is the overall weight of the infusion liquid. These fractions can also be expressed as percentages if the units of measure for the numerator and demoninator are the same.

12. Based on chemical potential and mass action as described by Fick's law,  acid migration during the infusion process is dictated by the concentration of acid in the infusion liquid relative to the concentration of acid in the decharacterized fruit. This simple analysis can be overwhelmed in complex systems where other more abundant species in the infusion process,

4

such as water and sugar, are also migrating, thereby changing the basis for any concentration measurement.

13.     The '861 patent uses percentage by weight, a by-weight measure of concentration as a proxy for chemical potential in the formulation process.  For example, the specification, in describing the formulation step, states that the "level," *i.e.*, concentration, of inherent soluble fruit component in the infusion liquid and the decharacterized fruit is "1% by weight." Col. 2, ll. 42-46. To one of ordinary skill in the art, the term "1% by weight" is standard notation for expressing a weight/weight measurement, not a weight/volume measurement.  It is noteworthy that nowhere does the '861 patent measure the level or concentration of inherent soluble fruit component by volume. The only by-volume measurements in the '861 patent relate to tannin levels (mg/L) in reconstituted juice where the tannin levels are used as a quality index for juice. *See, e.g.,* col. 11, l. 22

14.     Fick's law states that the velocity of mass transfer due to diffusion is equal to the product of the cross-sectional area, the diffusion coefficient and the concentration gradient. *See, e.g..,* R. Paul Sing & Dennis R. Heldman, Introduction to Food Engineering (Food Science and Technology, International Series), pp. 596-599 (3rd ed., Academic Press 2008).  This means that any time that the concentration of acid in the infusion liquid is greater than the concentration of acid in the decharacterized fruit, there will be no net migration of acid from the decharacterized fruit into the infusion liquid.  Concentration in this context must be expressed in units appropriate for those of the diffusion coefficient.  However, the direction of migration can be determined by comparing the concentrations irrespective of the units. The  gross weight of acid can only be used in this context if it is converted to a concentration.

5

15. Conversely, when the concentration of acid in the infusion liquid is lower than the concentration of acid in the decharacterized fruit, acid will flow from the fruit into the infusion liquid. In its essence, Ocean Spray's patented method relies on establishing at the formulation step a concentration gradient to generate either no infusion or net infusion of inherent soluble fruit component into the fruit (that is, no net extraction). It essentially ignores the substantial migration of water and sugar and their impacts on the concentration of inherent soluble fruit component.

16. The gross weight of acid in the decharacterized fruit and in the infusion liquid, respectively, does *not* define the concentration gradients that direct diffusion. The gross weight of acid in a solution can be calculated as the product of the mass of the solution and the concentration in appropriate units. This calculation is fundamental to mass and component balance, which are fundamental in engineering. *See id.* at 32-40.

17. However, while this link between gross weights of acid and concentration can be used to calculate concentration, gross weights *cannot* be used to calculate the direction of diffusion absent the ability to convert them to concentrations. Expressed differently, substituting a large volume of a dilute solution for a smaller volume of a more concentrated solution will not yield the same concentration gradient and thus not yield the same direction of diffusion. Gross weights must be converted to concentrations to apply Fick's law.

18. By example, a thimble full of a saturated salt solution placed in the ocean will result in a migration or diffusion of salt from the thimble into the ocean despite the fact that the total weight of salt in the ocean is greater than the total weight of salt in the thimble. This is because the concentration of salt in the thimble is greater than the concentration of salt in the ocean. Notwithstanding the greater total weight of salt in the ocean, the direction in which the

salt will migrate is dictated by the relative concentrations of salt in the thimble as compared to the ocean.

19.  From the perspective of one of ordinary skill in the art, the specification of the '861 patent also confirms that the inventor used the word "level" in the formulation step of the asserted claims to refer to weight/weight concentrations, not total amounts or total weights.

20.  This is because the specification makes clear that a comparison of the "level" of acid in the infusion syrup and the "level" of acid in the decharacterized fruit means a comparison of the relative concentrations of acid. *Id*. at col. 2, ll. 42-46 ("The infusion syrup is formulated such that the level of inherent soluble fruit component in the infusion syrup is approximately 1% *by weight*; *equal in concentration to the level in the decharacterized fruit.*"); col. 2, ll. 56-60 ("If the syrup is formulated to comprise a higher concentration of inherent fruit component than in the extracted fruit, there will be a net infusion of the inherent fruit components into the decharacterized fruit.").

**Infusion step**

21.  From the Stipulation, it appears that Ocean Spray defines "net extraction" of fruit component by reference to whether the "amount" of such component increases or remains the same. It is unclear what "amount" means, but insofar as it suggests the gross weight of fruit component, this definition is at odds with the patent language.

22.  The formulation and infusion steps of the patented method are inextricably connected. This is conspicuous from the fact that the specification, rather than *define* "net extraction," simply *describes* it as a function of the formulation step: "Preferably, there is no net extraction of the inherent component into the infusion media in the infusion step, i.e., the

7

infusion syrup is formulated such that the level of inherent fruit component is equal to or greater than that in the decharacterized fruit." Col. 2, ll. 56-60.

23. Since the formulation step must be understood as measuring the "level," or concentration, of inherent soluble fruit component in the infusion liquid on a weight/weight basis, net extraction rationally should be measured on the same basis. To one skilled in the art, it is implausible that the inventor who linked these two steps so closely could have meant for different measures to apply. As it happens, the language in the specification and the claims points away from this implausible outcome.

24. The recyclability of spent infusion liquid is a principal declared benefit of the patented method. *See, e.g.,* the last clause of the Abstract; col. 3 ll.19-20; and col. 9, ll. 57-58. This objective is made possible by maintaining and measuring particular concentrations—not particular weights--of inherent soluble fruit component. Concentrations of the fruit component in, respectively, the infusion solution and in the decharacterized fruit must be carefully controlled in order to achieve (and, conversely, to avoid) net extraction. *See* col. 2, ll. 38-47. No language in the specification or claims tells one of ordinary skill in the art that net extraction is measured by reference to the *weight* of the inherent soluble fruit component.

25. If Ocean Spray had intended for net extraction to be measured by weight rather than concentration, I would have expected the patent to disclose weight measurement as a proxy for net extraction and the conditions necessary for same, in order to enable those skilled in the art to practice the invention. Such a disclosure would presumably have included a discussion of the substantial migration of water and sugar during the infusion step and its impact on the process.

\*   \*   \*

26. In sum, Ocean Spray's argument that the formulation step of the '861 Patent requires or contemplates an infusion syrup with a gross, or total, weight of acid greater than or equal to that in the decharacterized fruit – without regard to relative concentrations – is wrong on its face, being contrary to both the specification of the patent and elementary principles of chemistry.

27. By the same token, a determination whether net extraction of fruit components from the fruit has occurred must be judged by reference to the concentration of acid in the fruit: Has it increased or decreased? Here, too, the patent lends no support to measuring net extraction by reference to weight.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of August, 2010.

_____
Eric Wilhelmsen

1902A/508 1315942

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the above date.

/s/ Joel R. Leeman

1902A/508 1315942